UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

LINDA A. MEYERS,

                          Plaintiff,

              v.

MICHAEL J. ASTRUE, Commissioner of
 Social Security,

                          Defendant.

_____

**REPORT
and
RECOMMENDATION**

**07-CV-0339A(F)**

APPEARANCES:        JEFFREY FREEDMAN ATTORNEYS
                    Attorneys for Plaintiff
                    REGINA A. WALKER, of Counsel
                    622 Liberty Building
                    424 Main Street
                    Buffalo, New York 14202

                    KATHLEEN M. MEHLTRETTER
                    Acting United States Attorney
                    Attorney for Defendant
                    JANE B. WOLFE,
                    Assistant United States Attorney, of Counsel
                    Federal Centre
                    138 Delaware Avenue
                    Buffalo, New York 14202

_____ **JURISDICTION**

        This action was referred to the undersigned by Honorable Richard J. Arcara on

August 16, 2007.  The matter is presently before the court on motions for judgment on

the pleadings filed on November 13, 2007 by Defendant (Doc. No. 6), and April 17,

2008 by Plaintiff (Doc. No. 10).

## BACKGROUND

Plaintiff Linda Meyers ("Plaintiff"), seeks review of Defendant's decision denying her Social Security Disability Insurance benefits ("SSDI"), and Supplemental Security Income ("SSI") (together, "disability benefits") under, respectively, Titles II and XVI of the Social Security Act ("the Act"). In denying Plaintiff's application for disability benefits, Defendant determined Plaintiff does not have an impairment or combination of impairments within the Act's definition of impairment. (R. 18).[1] Defendant further determined Plaintiff had the residual functional capacity to perform a wide range of sedentary work within twelve months of the alleged onset date, March 8, 2004, and had performed substantial gainful activity since March 2006. (R. 18-21, 291-93). Defendant also determined that even if the Plaintiff's medically determinable impairment could reasonably be expected to produce the alleged symptoms, its alleged persistence and limiting effects were not "entirely credible." (R. 19-21). As such, Plaintiff was found not disabled, as defined in the Act, at any time from the alleged onset date through the date of the Administrative Law Judge's decision. *Id.*

## PROCEDURAL HISTORY

Plaintiff filed applications for disability benefits on September 25, 2004, (R. 56-59); and were initially denied by Defendant on February 4, 2005. (R. 35-38). Pursuant to Plaintiff's request, filed February 16, 2005 (R. 39), a hearing was held before Administrative Law Judge William T. Vest, Jr. ("Vest") ("the ALJ") on July 25, 2006, in

---

[1] "R" references are to the page numbers of the Administrative Record submitted in this case for the Court's review.

Newport News, Virginia. The Plaintiff appeared at the hearing by video in Buffalo, New York,[2] represented by Regina A. Walker, Esq. (R. 287-310). Testimony was also given by vocational expert Peter A. Manzi ("Manzi") ("the VE"). (R. 302-10). The ALJ's decision denying the claim was rendered on August 25, 2006. (R. 13-23).

On August 30, 2006, Plaintiff requested review of the ALJ's decision by the Appeals Council. (R. 11-12). The ALJ's decision became Defendant's final decision when the Appeals Council denied Plaintiff's request for review on April 20, 2007. (R. 4-6). This action followed on May 25, 2007, with Plaintiff essentially alleging the ALJ erred by failing to consider her disabled as of March 2004, as well as whether Plaintiff's return to work in March 2006 constituted a trial work period. (R. 290).

Defendant's answer, filed August 14, 2007 (Doc. No. 3), was accompanied by the record of the administrative proceedings. On November 13, 2007, Defendant filed a motion for judgment on the pleadings ("Defendant's motion"), accompanied by a memorandum of law (Doc. No. 7) ("Defendant's Memorandum"). Plaintiff filed a motion for judgment on the pleadings ("Plaintiff's motion") on April 17, 2008, accompanied by a supporting memorandum of law (Doc. No. 10) ("Plaintiff's Memorandum"). Oral argument was deemed unnecessary.

Based on the following, Plaintiff's motion should be GRANTED, and the matter remanded for calculation of benefits; Defendant's motion should be DENIED.

---

[2] Plaintiff appeared by video at the discretion of the Administrative Law Judge pursuant to 20 C.F.R. § 404.936(c).

**FACTS**

Plaintiff, Linda A. Meyers ("Plaintiff"), was born on February 27, 1956, has a high school education, and worked most recently as a packer/machine tender from October 8, 2002 until March 8, 2004, a cook from 1976 through July 19, 2002, and a truck driver from July 30, 2002 through August 29, 2002.[3] (R. 86-103). Plaintiff is divorced, lives with one of her three grown children, and has worked as a secretary from February 9, 2006 until the date of the hearing. (R. 291-92). As of 2001, Plaintiff was employed at the packer/machine tender job, which often required Plaintiff to use a jackhammer to break apart shipments of pallets. (R. 303). Plaintiff alleges she injured her back at the packer/machine tender job on October 6, 2001. (R. 129).

On October 6, 2001, Plaintiff sought treatment from her primary physician, Orville Hendricks, M.D. ("Dr. Hendricks") for sudden onset of right cervical pain attributed to her work related incident on October 6, 2001. (R. 127-28). After examining Plaintiff, Dr. Hendricks prescribed a muscle relaxant and ordered an X-ray that showed narrowing at the C5-C6[4] disc space, sclerosis (abnormal hardening of body tissue), and spurring at C5-C6 and C4-C5. (R. 150). On October 17, 2001, Dr. Hendricks referred Plaintiff to Ranjana Luthra, M.D. ("Dr. Luthra"), a neurologist who, on October 17, 2001, evaluated Plaintiff as experiencing right hand weakness and radicular pain (pain radiating into lower extremity) in the C5-C6 vertebrae, tenderness at C5-C6, and mild restriction of

---

[3]Plaintiff stated her birth date as March 27, 1956 during the administrative hearing, (R. 291), however, the discrepancy is immaterial to the court's analysis.

[4] C5-6, C4-5, and C6-C7 refer to numbered cervical spine discs. *See generally*, Nerve Root Impingement– a common back problem, *available at* http://www.spine-health.com/topics/anat/confusion/confusion03.html.

4

right side neck movement. (R. 129-30). Dr. Luthra prescribed Robaxin (muscle relaxant), Medrol Dosepak (anti-inflammatory drug), Lortab (narcotic pain reliever), physical therapy evaluation and treatment, and ordered Magnetic Resonance Imaging ("MRI") of Plaintiff's cervical spine. (R. 130).

The MRI procedure performed on October 20, 2001, revealed diffuse disc bulge at both the C5-C6 and C6-C7 levels, and mild disc bulge at C4-C5, and also revealed bilateral neural foraminal (orifice) narrowing, effacement (thinning) of the anterior cerebrospinal fluid ("CSF") and posterior CSF, and presence of posterior osteophytes (bone spurs) most pronounced at the C5 vertebral level, which suggested minimal narrowing of the neural foramen at the C6-C7 level. (R. 119).

On October 26, 2001, Dr. Luthra re-evaluated Plaintiff and reported Plaintiff as experiencing C5-C6 tenderness, restriction of Plaintiff's neck movement in the vertical and horizontal plane and mild paravertebral spasm, and advised Plaintiff to continue drug treatment and physical therapy. (R. 128). Upon examination on November 9, 2001, Dr. Luthra reported Plaintiff showed "significant improvement," recommended continued use of drug and physical therapy, and that Plaintiff return to work at her packer/machine tender job on November 19, 2001. (R. 125-26).

Still complaining of pain, Plaintiff was discharged from physical therapy on November 23, 2001, and was advised to continue with a home exercise program (R. 120). Following Plaintiff's return to work on November 31, 2001, Plaintiff was re-examined by Dr. Luthra on January 17, 2002, stating she "finished her [physical] therapy and was feeling better," but was experiencing pain in the paravertebral area and

wanted to "try a neurosurgeon." (R. 122). An MRI of Plaintiff's cervical spine performed on October 20, 2001 revealed evidence of osteophyte with bulging at C5-C6, and disc protrusion at C4-C5 with neuroforaminal narrowing, leading Dr. Luthra to refer Plaintiff to neurosurgeon Jeffrey Lewis, M.D. ("Dr. Lewis"). *Id.*

On January 30, 2002, Dr. Lewis, after examining Plaintiff on January 25, 2002, (R. 214-16), recommended anterior cervical microdiscectomy and fusion at C5-C6, which Dr. Lewis performed on September 3, 2002. (R. 141-42). Plaintiff continued to work up until the surgery. (R. 103). Postoperative visits on September 9, 2002, September 30, 2002, November 11, 2002, January 8, 2003, and March 14, 2003, showed definite improvement in the preoperative right arm and thumb, and persistent but "much less" severe shoulder pain. (R. 205-12). A second postoperative exam on October 1, 2002, showed "slow and steady progress," no complaints of any significant neck pain or radiculopathy into lower extremities, but intermittent residual numbness in the index and ring fingers. (R. 210). After reviewing anterior-posterior lateral X-rays, Dr. Lewis noted Plaintiff's fusion was "ensuing quite nicely at C5-6," and that the Plaintiff was "interested in returning to work," but did not think return to work as a truck driver or delivery person would be possible any time in the future. (R. 211). Plaintiff was advised by Dr. Lewis to continue using a bone fusion stimulator and to seek vocational education and rehabilitation. Dr. Lewis recommended a return to work in October, 2002 with light duty restrictions, noting Plaintiff had already resumed working in a light duty capacity, and instructed Plaintiff to notify his office of any symptomatic exacerbations at which time she would be taken out of work. (R. 225). According to the record, Plaintiff

returned to work on October 8, 2002 and worked until March 2004. (R. 103).

On January 8, 2003, Plaintiff returned to Dr. Lewis with complaints of a swallowing dysfunction, but without complaints of neck or arm pain and reported significant relief of the preoperative pain. (R. 206). Dr. Lewis referred Plaintiff to Linda Nabi, M.D. ("Dr. Nabi") for an evaluation of the swallowing trouble. *Id.* Subsequent examinations by Dr. Lewis showed Plaintiff pain free and working without difficulty in a light duty capacity, leading Dr. Lewis to discharge her from care. (R. 205).

On September 25, 2003, Plaintiff returned to Dr. Lewis complaining of severe neck pain radiating into the right high trapezius muscle, located between the right shoulder and middle of the back, accompanied by diffuse right arm pain and numbness. (R. 203-04). Dr. Lewis's examination showed limited cervical range of motion, and tenderness in Plaintiff's right paraspinal cervical musculature and high trapezius muscle, prompting a cervical MRI and CT to rule out pseudoarthrosis.[5] *Id.* The MRI showed disc bulging above and below C5-C6 without herniation. (R. 201). A diagnosis of neural foraminal stenosis led Dr. Lewis to recommend a right C5-C6 foraminotomy surgery, which was later performed successfully by Dr. Lewis on March 9, 2004. (R. 200).

A postoperative examination by Dr. Lewis on March 19, 2004, showed Plaintiff with improved distal arm pain and "overall benefit from surgery." (R. 200). Although Plaintiff was instructed to remain on total disability, Dr. Lewis noted a possible return to

---

[5] Pseudoarthrosis is a failed spinal fusion in which the segments of vetebral bone do not merge over the disc space. *See* http://spine-health.com/glossary/n/non-union.

work dependent upon recovery prior to a subsequently scheduled eight week office visit. *Id*. A postoperative examination by Dr. Lewis on April 4, 2004 showed Plaintiff with improved distal arm pain and numbness, but incisional discomfort and spasm radiating into the occiput (back of the head), prompting Dr. Lewis to recommend physical therapy and place Plaintiff on total disability. (R. 199). After examining Plaintiff on May 21, 2004, Dr. Lewis ordered an MRI and CT scan, and continued Plaintiff's total disability status until July 24, 2004. (R. 198).

Although the reconstruction CT scan and MRI showed excellent fusion at Plaintiff's C5-C6, and good foraminotomy at C5-C6, the MRI showed a possible annular tear at C6-C7, and right sided disc herniation at C4-C5 effacing the anterior subarachnoid (area beneath the membrane surrounding the spinal cord) space, leading Dr. Lewis to recommend as further surgery an anterior cervical microdiscectomy and fusion with allograft bone and anterior plate at C4-C5. (R. 193).[6] On July 16, 2004, Dr. Lewis reported to Dr. Luthra that Plaintiff returned to light duty work on October 8, 2002, remaining partially disabled until March 9, 2004, when she was placed on total disability. (R. 193-94). Dr. Lewis further reported that the work Plaintiff had been doing between October 8, 2002 and March 9, 2004 was "light," but that as of March 9, 2004, the date of Plaintiff's C5-C6 foraminotomy surgery, Plaintiff "is totally disabled and will remain on total disability." (R. 194).

On August 20, 2004, an independent medical examination ("IME") was performed on behalf of the New York State Worker's Compensation Board by Gerald Coniglio, M.D.

---

[6] The MRI and CT scan records are not in the record, however, the results of such testing are found at R. 193.

("Dr. Coniglio"). (R. 185-92). Dr. Coniglio suggested further medical treatment and diagnostic study instead of the surgical intervention recommended by Dr. Lewis and noted Plaintiff was able to return to work with a U.S. Department of Labor job described as "sedentary/light," where she would be able to move at will, and not be required to perform repetitive work with her upper extremities for longer than ten minutes, at which time she must be able to rest for ten minutes. (R. 191). Dr. Coniglio opined Plaintiff was "temporarily disabled to a moderate degree," but must not be required to push, pull, twist or apply an axial force greater than ten pounds with her upper extremities, and could not work with her arms above chest level. *Id.* Dr. Coniglio recommended a series of epidural steroid injections, and EMG (electromyogram) and NCV (Nerve Conduction Velocity) tests to eliminate the possibility of peripheral compressive neuropathy producing a double crush syndrome. (R. 192).

On September 17, 2004, Dr. Lewis disputed Dr. Coniglio's IME report in part because the recommended tests were "painful" and "unreliable", further protesting that Plaintiff "[was] in the office . . . crying because her pain is so severe and not responsive to Hydrocodone," and that Plaintiff "d[id] not want to under[go] epidural steroid injections or undergo the EMG and nerve conduction studies being that it [wa]s not going to change [the] recommendation for treatment." (R. 182)(bracketed material added). Subsequent treatment notes dated November 5, 2004, and January 17, 2005, by Dr. Lewis, show Plaintiff remained in "disabling pain." (R. 179-81). As of January 17, 2005, Dr. Lewis found Plaintiff to suffer from "break through pain" that required prescription pain killers, including Hydrocodone, and remained totally disabled. *Id.*

A consultative orthopedic examination performed by Fenwei Meng, M.D. ("Dr.

Meng") on November 11, 2004, showed mild tenderness of the cervical spine with mild to moderate limitations with bending, tension and head turning, no limitation with dexterity or gross activities, and mild to moderate limitations with lifting, pushing, and reaching. (R. 165-66). Plaintiff's upper extremity motion was noted as full, without inflammation, effusion, or instability. (R. 165).

On February 10, 2005, Plaintiff underwent surgery, performed by Dr. Lewis, for removal of the anterior cervical plate at C5-C6, and an anterior cervical microdiscectomy, intrabody fusion, allograft bone and anterior plate C4-C5. (R. 171-72). Plaintiff's post operative examinations by Dr. Lewis showed resolved preoperative arm pain, and "good" fusion taking place. (R. 176-77). During a follow-up visit April 27, 2005, Dr. Lewis reported Plaintiff was "significantly better" after the C4-C5 fusion, and that x-rays showed good fusion taking place "although it was too early to be certain of a solid union." *Id*. Dr. Lewis also reported Plaintiff was "not going to be able to return to heavy work," prompting him to refer Plaintiff to Vocational and Educational Services for Individuals with Disabilities ("VESID") for job retraining. (R. 176).

On August, 4, 2005, Plaintiff returned to Dr. Lewis complaining of recurrent "severe pain" in the neck, and Dr. Lewis suggested physical therapy, noting pseudoarthrosis must be considered because Plaintiff is a heavy smoker. (R. 173-77). [7] Dr. Lewis again prescribed Hydrocodone and continued Plaintiff on total disability. (R. 174-75). A subsequent visit to Dr. Lewis on October 7, 2005 showed Plaintiff with residual pain, but significantly improved. (R. 173).

---

[7] Pseudoarthrosis is a failed spinal fusion and occurs more frequently in heavy smokers. *See* http://www.spine-health.com/glossary/n/non-union.

On November 21, 2005 during an IME by Fred Cohen, M.D. ("Dr. Cohen"), Plaintiff's symptoms included right occipital headaches, neck pain, and right hand numbness. (R. 238). Dr. Cohen reported normal strength in upper and lower extremities, no Tinel's signs (tingling) at wrists or elbows, and right upper extremity motion difficulty lacking specific muscle weakness. (R. 239). Plaintiff exhibited fair to poor right grip with no weakness in individual muscles, but had complaints of right arm pain during low back motion although her back examination was normal. Straight leg raising was 90 degrees on either side. Range of motion of the neck was limited, especially in right lateral rotation. (R. 240). Dr. Cohen noted Plaintiff's two cervical discectomies and fusions as well as the posterior cervical laminectomy and foraminotomy, and that Plaintiff was experiencing persistent symptoms in her right upper extremity. Dr. Cohen diagnosed Plaintiff's degree of disability as "moderate to mild, temporary and partial" further stating Plaintiff was capable of sedentary and light duty work as defined by the Dictionary of Occupational Titles, entailing occasionally exerting twenty pounds, frequently exerting up to ten pounds, or constantly exerting and capable of a significant degree of walking, standing, pushing and pulling. (R. 240).

On February 15, 2007, at the request of the Worker's Compensation Board, W. Jay Levy, M.D. ("Dr. Levy") conducted an IME of Plaintiff. (R. 278). Plaintiff's chief complaints were a toothache, "clicking" in the back of her neck, and consistent right arm numbness. (R. 278). Plaintiff exhibited no paraspinal tenderness, no scoliosis, and normal lordosis. *Id*. Plaintiff's lumbar flexion was approximately 90 degrees with zero degree extension. Lateral bending to right and left was ten degrees, and cervical movement was noted as two-thirds normal in left and right rotation, flexion, and extension. (R. 282). Dr. Levy's

suggested treatment regimen included a trial of pain center management with epidural or other blocks, and noted surgery to be a last resort after conservative therapies were exhausted. *Id.*

Plaintiff appeared and testified at the administrative hearing by video on July 25, 2006. (R. 287). Plaintiff testified she is able to socialize, shop, dress and bathe without difficulty, and able to perform ordinary household chores like dusting, but not vacuuming, cutting grass, or shoveling snow because of pain restrictions. (R. 293-94). Plaintiff testified she takes Lortab for the pain, but experiences a "tingling sensation" when engaging in repetitive motion or "staying too long in one spot," and is unable to work for more than six hours a day. (R. 295-98). Plaintiff testified she has been employed as a secretary since February 9, 2006, and works six hours a day four days per week. (R. 298). Plaintiff also argued that Plaintiff's part-time work as a secretary commencing February 9, 2006 should be considered a trial work period. (R. 290).[8]

## DISCUSSION

1.    **Disability Determination Under the Social Security Act**

An individual is entitled to disability insurance benefits under the Social Security Act if the individual is unable

> to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can
> be expected to last for a continuous period of not less than 12

---

[8]Although Plaintiff's attorney contends the ALJ should consider Plaintiff as engaging in a trial work period, (Plaintiff's Memorandum at 8 citing R. 290), the relevant regulation indicates Plaintiff's attorney most likely intended to refer to Plaintiff as engaging in what could be considered an unsuccessful work attempt under 20 C.F.R. § 404.1574(c) rather than a trial work period pursuant to 20 C.F.R. § 1592(a) .

months. . .. An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

42 U.S.C. §§ 423(d)(1)(A) & (2)(A), and 1382c(a)(3)(A) & (C)(I).

Once a claimant proves he or she is severely impaired and unable to perform any past relevant work, the burden shifts to the Commissioner to prove there is alternative employment in the national economy suitable to the claimant. *Parker v. Harris,* 626 F.2d 225, 231 (2nd Cir. 1980).

**A.  Standard and Scope of Judicial Review**

The standard of review for courts reviewing administrative findings regarding disability benefits, 42 U.S.C. §§ 401-34 and 1381-85, is whether the administrative law judge's findings are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence requires enough evidence that a reasonable person would "accept as adequate to support a conclusion." *Consolidated Edison Co. v. National Labor Relations Board*, 305 U.S. 197, 229 (1938).

While evaluating a claim, the Commissioner must consider "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability (testified to by the claimant and others), and . . . educational background, age and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)). If the opinion of the treating physician is supported by medically acceptable techniques and results from frequent examinations, and the opinion supports the administrative record, the treating physician's opinion will be

given controlling weight.  *Scherler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993); 20 C.F.R. §
404.1527(d); 20 C.F.R. § 416.927(d).

The Commissioner's final determination will be affirmed, absent legal error, if it is
supported by substantial evidence.  *Dumas v. Schweiker, supra*, at 1550; 42 U.S.C. §§
405(g) and 1383(c)(3).  "Congress has instructed . . . that the factual findings of the
Secretary,[9] if supported by substantial evidence, shall be conclusive."  *Rutherford v.
Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

The applicable regulations set forth a five-step analysis the Commissioner must
follow in determining eligibility for disability insurance benefits.  20 C.F.R. §§ 404.1520 and
416.920.  *See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *Berry v. Schweiker*, 675
F.2d 464 (2d Cir. 1982).  The first step is to determine whether the applicant is engaged in
substantial gainful activity during the period of which benefits are claimed.  20 C.F.R. §§
404.1520(b) and 416.920(b).  If the claimant is engaged in such activity the inquiry ceases
and the claimant is not eligible for disability benefits.  *Id.*  The next step is to determine
whether the applicant has a severe impairment which significantly limits the physical or
mental ability to do basic work activities as defined in the applicable regulations.  20 C.F.R.
§§ 404.1520(c) and 416.920(c).  Absent an impairment, the applicant is not eligible for
disability benefits.  *Id.*  Third, if there is an impairment and the impairment, or an
equivalent, is listed in Appendix 1 of the regulations and meets the duration requirement,
the individual is deemed disabled, regardless of the applicant's age, education or work

---

[9] Pursuant to the Social Security Independence and Program Improvements Act of 1994, the
function of the Secretary of Health and Human Services in Social Security cases was transferred to the
Commissioner of Social Security, effective March 31, 1995.

experience, 20 C.F.R. §§ 404.1520(d) and 416.920(d), as, in such a case, there is a presumption the applicant with such an impairment is unable to perform substantial gainful activity.[10] 42 U.S.C. §§ 423(d)(1)(A) and 1382(c)(a)(3)(A); 20 C.F.R. §§ 404.1520 and 416.920. *See also Cosme v. Bowen*, 1986 WL 12118, * 2 (S.D.N.Y. 1986); *Clemente v. Bowen*, 646 F.Supp. 1265, 1270 (S.D.N.Y. 1986).

However, as a fourth step, if the impairment or its equivalent is not listed in Appendix 1, the Commissioner must then consider the applicant's "residual functional capacity" and the demands of any past work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the applicant can still perform work he or she has done in the past, the applicant will be denied disability benefits. *Id.* Finally, if the applicant is unable to perform any past work, the Commissioner will consider the individual's "residual functional capacity," age, education and past work experience in order to determine whether the applicant can perform any alternative employment. 20 C.F.R. §§ 404.1520(f), 416.920(f). *See also Berry v. Schweiker, supra*, at 467 (where impairment(s) are not among those listed, claimant must show that he is without "the residual functional capacity to perform [her] past work"). If the Commissioner finds that the applicant cannot perform any other work, the applicant is considered disabled and eligible for disability benefits. *Id.* The applicant bears the burden of proof as to the first four steps, while the Commissioner bears the burden of proof on the final step relating to other employment. *Berry, supra*, at 467. In reviewing the administrative finding, the court must follow the five-step analysis to determine if there was substantial evidence on which the Commissioner based the

---

[10] The applicant must meet the duration requirement which mandates that the impairment must last or be expected to last for at least a twelve-month period. 20 C.F.R. §§ 404.1509 and 416.909.

decision.  *Richardson v. Perales*, 402 U.S. 389, 410 (1971).

**B.**   **Substantial Gainful Activity**

The first inquiry is whether the applicant engaged in substantial gainful activity.
"Substantial gainful activity" is defined as "work that involves doing significant and
productive physical or mental duties" done for pay or profit.  20 C.F.R. § 404.1510(a)(b).
Substantial work activity includes work activity that is done on a part-time basis even if it
includes less responsibility or pay than work previously performed.   20 C.F.R. §
404.1572(a). Earnings may also determine engagement in substantial gainful activity. 20
C.F.R. § 404.1574.  In this case, the ALJ concluded Plaintiff engaged in substantial gainful
activity since March 8, 2004, the onset date of the alleged disability.  (R. 18).

Plaintiff alleges a disability onset of March 8, 2004. Complaint ¶ 6.  Plaintiff admits
having engaged in employment as a secretary since March 2006. (R. 290). Unless an
impairment is expected to result in death, the disability must have lasted or must be
expected to last for a continuous period of at least twelve months to comply with the Act's
duration requirement. 20 C.F.R. § 404.1509.  For the purposes of this case, the disability
period must commence on or after March 8, 2004 as Plaintiff claimed, and continue for
twelve months to meet the duration requirement in the Act.

The ALJ ruled Plaintiff was not disabled because she engaged in substantial gainful
activity after March 8, 2004. (R. 17). Specifically, the ALJ states " [a]lthough the claimant
alleges that she has been disabled since March 8, 2004, the record shows she has worked
at SGA levels since that date." (citing 20 C.F.R. § 404.1571). (R. 17).  According to 20
C.F.R. § 404.1571, "[t]he work, without regard to legality, that you have done during any
period in which you believe you are disabled may show that you are able to do work at the

substantial gainful activity level." 20 C.F.R. § 404.1571. Notably, the substantial gainful activity must be performed during the alleged disability period to defeat any potential claim for disability. *Melville v. Apfel*, 198 F.3d 45, 52 (2nd Cir. 1999) (discussing that work done during the alleged period of disability may show claimant is able to do work at the SGA level).

Although the ALJ determined that Plaintiff performed SGA since March 8, 2004, (R. 17), the record establishes that the Plaintiff's substantial gainful activity began March 1, 2006 almost two full years later. (R. 47, 48, 301). Plaintiff's return to secretarial work on March 1, 2006 does not demonstrate that Plaintiff could or should have returned to substantial gainful activity at some earlier date during the alleged disability period. *Sachs v. Commissioner of Social Security*, 567 F. Supp. 2d 423, 430 (W.D.N.Y. 2008) (discussing the fact that a plaintiff's physical ability to return to work does not by itself suggest plaintiff should or could have returned to work at some earlier date). Rather, the record establishes that Plaintiff was disabled at least for the closed period commencing March 2004 and continuing through March 2006. *See Moore v. Commissioner of Social Security Administration*, 278 F.3d 920, 924 (9th Cir. 2002) (recognizing the SSA regulations provide disability benefits may be awarded for a closed period lasting at least 12 months even after claimant returns to work); *Goldstein v. Harris*, 517 F. Supp. 1314, 1317 (S.D.N.Y. 1981) (ALJ erred in concluding plaintiff's return to work within twelve months of alleged disability period, constituting substantial gainful activity, demonstrated he was not previously disabled, a result that "would contravene the general rule that the Social Security Act be considered a remedial statute to be broadly construed and liberally applied.") (internal quotation marks and citations omitted).

Specifically, the record establishes by substantial evidence, Discussion, *infra*, at 17-25, Plaintiff met, at least for the period March 8, 2004 to March 2006, the criteria for disability based on §1.00 of the Listing of Impairments. As such, the matter should be remanded for calculation of benefits for the period of disability commencing March 8, 2004 and continuing through at least September 30, 2006.

## C.    Severe Physical or Mental Impairment

The second step of the analysis requires a determination whether Plaintiff had a severe medically determinable physical or mental impairment that meets the duration requirement in 20 C.F.R. § 404.1509 and significantly limits the Plaintiff's ability to do "basic work activities."  The Act defines "basic work activities" as "abilities and aptitudes necessary to do most jobs," and includes physical functions like walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b).

The ALJ found Plaintiff had a severe impairment (cervical disc disease) as defined under 20 C.F.R. § 404.1520(c), and that the impairment and its symptoms limited Plaintiff's ability to "perform the strength demands of basic work activities, including standing, walking, lifting, carrying, and engaging in postural activities." (R. 17). Plaintiff does not contest these findings. The ALJ also found Plaintiff's other impairments were "nonsevere" because they did not exist for a period of twelve months, were responsive to medication, did not require any significant medical treatment, and did not result in any exertional or nonexertional functional limitations. (R. 18). Plaintiff contests these findings.

**D.    Listing of Impairments, Appendix 1**

The third step is to determine whether a claimant's impairment or impairments are listed in the regulations at Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P ("The Listing of Impairments").  If the impairments are listed in the Appendix, and the duration requirement is satisfied, the impairment or impairments are considered severe enough to prevent the claimant from performing any gainful activity and the claimant is considered disabled.  20 C.F.R. §§ 404.1525(a), 416.925(a); *Melville v. Apfel*, 198 F.3d. 45, 51 (2d Cir. 1999) ("if the claimant's impairment is equivalent to one of the listed impairments, the claimant is considered disabled"). The relevant listing of impairments in this case includes 20 C.F.R. Pt. 404, Subt. P, Appendix 1, § 1.00 (Musculoskeletal System).

Disorders of the musculoskeletal system may result from hereditary, congenital, or acquired pathologic processes, and may result from infectious, inflammatory, or degenerative processes, traumatic or developmental events. C.F.R. Pt. 404, Subt. P, Appendix 1 § 1.00 (A). In considering whether a plaintiff is disabled by a disorder of the musculoskeletal system, loss of function is defined as "the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason including pain associated with the underlying musculoskeletal impairment." 20 C.F.R. Pt. 404, Subt. P, Appendix 1  § 1.00(B)(2)(a). Loss of function may result from bone or joint deformity, or destruction from any cause, miscellaneous disorders of the spine with or without radiculopathy, or other neurological deficits. 20 C.F.R. Pt. 404, Subt. P, Appendix 1 § 1.00(B)(1). The inability to ambulate effectively or perform fine and gross movements must have lasted for at least

twelve months, and is defined as "an extreme limitation of the ability to walk, (for example an impairment that interferes very seriously with an individual's ability to initiate, sustain, or complete activities)." 20 C.F.R. Pt. 404, Subt. P, Appendix 1 § 1.00(B)(2)(b)(1).

The inability to perform fine and gross motor skills effectively as a basis for disability resulting from a musculoskeletal impairment is defined as

> an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R. Pt. 404, Subt. P, Appendix 1 § 1.00(B)(2)(c).

Pain or other symptoms may also be important factors contributing to functional loss. 20 C.F.R. § 404.1529(c)(3). Pain or other symptoms affect a claimant's ability to perform basic work activities if relevant medical signs or laboratory findings show the existence of a medically determinable impairment that could "reasonably" be expected to cause the associated pain or other symptoms. *Id*. Persistence and intensity of pain and other symptoms are used to determine the degree of adverse impact on an individual's functioning capacity. 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 1.00(B)(2)(d).

According to Section 1.04 of the Listing of Impairments, a person may be disabled based on disorders of the spine if medical evidence demonstrates herniated nucleus

pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture, resulting in compromise of a nerve root or the spinal cord, and is accompanied by one of the following:

> A.    Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B.    Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> or
>
> C.    Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, Appendix 1, §1.04.

In this case, the ALJ, as required, evaluated Plaintiff's impairment under 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526, directed to consideration of the Listing of Impairments, determining the impairment was not accompanied by the required clinical signs and diagnostic findings under the Act. (R. 18). Specifically, the ALJ concluded the record did not establish substantial evidence of "nerve root compression accompanied by motor loss, sensory or reflex loss and positive straight leg raising; spinal arachnoiditis manifested by severe burning or painful dysthesia, resulting in the need for changes in the

position or posture more than once every 2 hours; or lumbar stenosis resulting in pseudoclaudication, and resulting in inability to ambulate effectively" as defined in the Act. *Id*. Contrary to the ALJ finding that the record did not provide evidence of "nerve root compression," or "sensory or reflex loss accompanied by motor loss," (R. 18), the court finds the record establishes that Plaintiff's degenerative disc disease meets the criteria of a disorder of the spine as defined under Section 1.04.

In particular, the record establishes Plaintiff suffered central disc herniation with moderate spondylosis at C5-C6, surgically corrected by Dr. Lewis on September 3, 2002. (R. 141-42). Plaintiff, however, suffered a return of additional symptoms and disc herniation resulting in a right posterior cervical microsurgical foraminotomy also performed by Dr. Lewis on March 9, 2004. (R. 159). Dr. Lewis's surgical notes from March 9, 2004, indicate evidence of nerve root compression. Specifically, Dr. Lewis noted that

> [d]rilling occurred with the rough diamond drill. C6 root was found underneath the C6 facet by thinning the bone to a thin flake and then curetting [scraping] off the thin shell of the bone. More aggressive drilling of the facet bone was done and curet was used to lift out the residual facet of C6 out of the foramen, full[y] exposing and decompress the nerve root, both on its superior ventral and dorsal aspect. Kerrisons were used to finish the fasciectomy and foraminotomy. Excellent decompression of the nerve was obtained with the venus vascular cuff left intact so that the minimal bipolar cautery was used for hemostasis along with some Gelfoam.

(R. 159)(underlining and bracketed material added).

The necessity of Dr. Lewis's procedure to surgically decompress the Plaintiff's nerve root provides evidence of the presence of nerve root compression in Plaintiff's spine as of March 2004, Plaintiff's onset date, as required under 20 C.F.R. Pt. 404, Subpt. P,

Appendix 1, §1.04 required to establish Plaintiff's disability as of that date. The record thus establishes by substantial evidence that Plaintiff suffered nerve root compression no later than March 2004 as required by Section 1.04(A) to support a finding of disability. Significantly, the ALJ fails to make any reference to Dr. Lewis's finding of nerve root compression and Dr. Lewis's surgical procedure to relieve such nerve compression. (R. 15-23 *passim*).

In addition, Plaintiff's subsequent medical examinations for normal gait and sensory examinations noted the presence of reflex loss and limited range of motion. (R. 189). Specifically, an examination by Dr. Coniglio on August 25, 2004 showed

> Examination of the cervical spine reveals that the claimant is tender in the mid to lower portion of the cervical spine: <u>flexion is 4 fingers from the chest, which equals 15 degrees, normal is 60 with pain. Extension 15 degrees, normal is 60 with tightness in the neck. Right lateral rotation is 45 degrees, normal is 70 with tightness in the neck. Left rotation is 45, normal is 70</u> with a feeling of a sprain or strain or a feeling of discomfort in the right shoulder.

(R. 189-90)(underlining added).

Dr. Coniglio's examination also showed Plaintiff suffered from reflex abnormalities. Specifically, the examination revealed

> Deep tendon reflexes (reported on a 4/4 basis, right over left where 2/2 is normal) as follows: Biceps ½; Brachioradialis 2/2; Extensor carpi radialis brevis 2/2; Triceps ½ 190). Range of motion was also limited and noted: Range of motion of the cervical spine: flexion is 4 fingers from the chest, which equals <u>15 degrees, normal is 60 with pain. Extension 15 degrees, normal is 60 with tightness in the neck. Right lateral rotation is 45 degrees, normal is 70 with tightness in the neck. Left rotation is 45, normal is 70</u> with a feeling of a sprain or strain or a feeling of discomfort in the right shoulder.

(R. 190) (underlining added).

Dr. Coniglio's August 25, 2004 examination notes further indicate Plaintiff has "pain in the right shoulder with numbness in the fingers and in the back of the head. All pain is aggravated by activity. Routine level of pain is a 7, when it is bad it is a 10." *Id.* (underlining added). These findings are consistent with Dr. Lewis's findings that Plaintiff's postoperative examinations typically showed a return of low right sided neck pain with diffuse numbness and tingling of the right arm. (R. 174, 176, 181, 182, 196, 201).

Although the ALJ did not consider Plaintiff's limited range of motion of the cervical spine and diminished reflexes in the third step of the analysis, the ALJ, without explanation, utilized these findings in a later discussion of Plaintiff's residual functional capacity. (R. 20). Further, although Plaintiff did not lose her ability to ambulate effectively on a sustained basis, the record establishes her inability to perform fine and gross movements effectively on a sustained basis because of pain associated with her underlying musculoskeletal impairment as required under C.F.R. Pt. 404, Subt. P, Appendix 1 § 1.00(B)(2)(a).

For example, during an examination by Dr. Lewis on May 21, 2004, Plaintiff was experiencing "severe cervical pain," pain at the base of the skull, and pain throughout her right arm. (R. 196). Dr. Coniglio's examination on August 25, 2004, also showed Plaintiff as experiencing pain in her right shoulder and back of her head, numbness in her fingers, and that all of Plaintiff's activities were aggravated by pain. (R. 186). Dr. Coniglio further noted Plaintiff's routine level of pain as a "7," and that when her pain level was bad, it was a "10." *Id.* During Dr. Coniglio's examination on August 25, 2004, Plaintiff stated her

24

everyday activities were "assisted by her son who does things like vacuuming, mopping and carrying heavy objects, such as laundry baskets." (R. 187). Plaintiff stated that although she was able to wash her dishes, she formerly could do anything before the onset of her disc problems, and "wants her life back." *Id*. Dr. Coniglio opined that although Plaintiff was able to return to "sedentary" work, she must not be made to do upper extremity repetitive work for more than ten minutes at which time she must be able to take a ten-minute break, and must not be made to "push, pull, twist or apply an axial force of greater than ten pounds with [her] upper extremities" and must not be made to work with her arms above chest level. (R. 191). An examination by Dr. Lewis on August 4, 2005, showed Plaintiff experiencing severe pain across her shoulders that interfered with her ability to sleep. (R. 174). Plaintiff testified she experienced pain in the top of her neck and hand accompanied by numbness after six or seven hours of work. (R. 299). Based on his examination, Dr. Lewis renewed Plaintiff's prescription for the pain killer Hydrocodone and found she remained totally disabled. (R. 174).

As of October 7, 2005, while Plaintiff had "significantly improved," and had commenced job retraining, Dr. Lewis continued Plaintiff on Lortab, a prescription drug for "pain control" and expected to order a cervical X-ray in four months. (R. 173). However, Plaintiff subsequently attempted to work as a secretary in February 2006, (R. 298), and the record does not reveal that the expected follow-up X-ray and evaluation by Dr. Lewis were performed. The absence of any medical opinion specifically stating that Plaintiff remained disabled during the period between August 2005 and March 2006 does not bar the reasonable inference that Plaintiff remained disabled during that period as the fact that

a medical improvement related to the ability to do work has occurred does not necessarily mean that it is also shown the claimant is then currently able to engage in substantial gainful activity. 20 C.F.R. § 416.994(b)(1)(iii). Further, it is the commissioner's burden to establish that a claimant has had medical improvement sufficient to end the claimant's disability. *DeLeon v. Secretary of Health and Human Services*, 734 F.2d 930, 937 (2d Cir. 1984). Here, the record is devoid of evidence that except for Plaintiff's attempt to reenter the work force in February 2006, following retraining, Plaintiff had the capacity to engage in substantial gainful activity. For example, as of her October 2005 examination by Dr. Lewis, Plaintiff continued to take Lortab for her pain. The ALJ's assertion that Plaintiff's complaints regarding the "intensity, persistence and limiting effects" of Plaintiff's symptoms were "not entirely credible" is not supported by the record. (R. 19). Specifically, neither Dr. Coniglio nor Dr. Cohen, who performed IME's of Plaintiff, indicated they believed Plaintiff was exaggerating her symptoms. *See Pratts v. Chater*, 94 F.3d 34, 37-38 (2d Cir. 1996) (finding substantial evidence did not support the ALJ's decision that the claimant was not credible where, *inter alia*, the ALJ made several factual errors in evaluating the medical evidence). Rather, Plaintiff's undisputed attempt to engage in retaining and return to work thereafter reinforces her credibility. *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d. Cir. 1983) ("A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability.")

The record thus contains substantial evidence of Plaintiff's inability to perform fine and gross movements effectively on a sustained basis because of pain associated with her underlying musculoskeletal impairment as required under C.F.R. Pt. 404, Subt. P,

Appendix 1 § 1.00(B)(2)(a), thereby establishing that Plaintiff met the criteria for disability based on Plaintiff's spine disorder under the Listing of Impairments 20 C.F.R. Pt. 404, Subt. P, Appendix 1, § 1.00(B)(2)(d), specifically, degenerative disk disease of the cervical spine.

Nor did the ALJ properly apply the treating physician rule. The treating physician's rule requires the ALJ give a treating physician's opinion "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). In particular, the Act provides

> [g]enerally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2); *Clark v. Commissioner of Soc. Sec.*, 114 F.3d. 115, 118 (2d Cir. 1998).

The regulations define "treating source" as a claimant's "own physician, psychologist, or other acceptable medical source who provides [a claimant] ... with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. §404.1502.

In this case, the frequency and nature of Dr. Lewis's multiple examinations and three surgical interventions establish Dr. Lewis is Plaintiff's treating physician with regard to Plaintiff's back impairment. Specifically, Dr. Lewis started treating Plaintiff in January 2002 and continued treating Plaintiff on a regular basis until March 2006. In particular, before Plaintiff's surgery on March 9, 2004, Dr. Lewis examined Plaintiff. Following Plaintiff's March 9, 2004 surgery, Dr. Lewis examined Plaintiff March 19, 2004, April 4, 2004, May 21, 2004, July 14, 2004, September 15, 2004, November 3, 2004, and January 12, 2005. (R. 179-84; 193-99; 200). Examinations of Plaintiff by Dr. Lewis following Plaintiff's additional cervical spine surgery since February 10, 2005 occurred on February 23, 2005, April 27, 2005, August 4, 2005, and October 7, 2005. (R. 173-77). The ALJ did not dispute that Dr. Lewis's treatment of Plaintiff qualified Dr. Lewis as Plaintiff's treating physician.

Although a treating physician's opinions are not determinative and are given controlling weight only when not inconsistent with the other controlling evidence, 20 C.F.R. §404.1527(d); *Halloran v. Barnhart*, 362 F.3d 28, 31-31 (2d Cir. 2004) (citing *Vieno v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993)), Dr. Lewis's opinions are supported by numerous diagnostic MRI and CT scans, and regular consultations with the Plaintiff about her pain and other associated symptoms. (R. 173-84; 193-216 *passim*). Nevertheless, the ALJ erred by not giving Dr. Lewis's treating physician opinion that Plaintiff remained totally disabled as of August 8, 2005 (R. 175) controlling weight, by failing to take account of specific findings made by Dr. Lewis consistent with Plaintiff's claim, and, without discussion, disregarding Dr. Lewis's findings

(R. 18). As such, the ALJ further violated the Act's requirement that requires an ALJ always give "good reasons in [the] notice of determination or decision for the weight given a claimant's treating source's opinion." § 404.1527(d)(2).

Certain factors must be considered by the court in determining whether an ALJ correctly refused to give the "treating physician's opinion" controlling weight. These factors include: "i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Clark* 143 F.3d. at 118. Generally, the longer a claimant is treated and seen by a treating source, the more weight is to be afforded by the ALJ to the treating source's medical opinion, §404.1527(d)(2)(I), and added weight is given to specialist opinions and opinions supported by laboratory tests. *Id*. In this case, as discussed below, although all four factors support Dr. Lewis's opinion, and the ALJ disregarded the opinion without explanation required by §404.1527(d)(2).

Specifically, the ALJ found the record indicated Plaintiff demonstrated limited range of motion of the cervical spine and neck, diminished reflexes, poor right grip strength, and neck pain exacerbated by activity, but that the medical evidence supported Plaintiff's ability to return to a wide range of sedentary work within twelve months of the disability onset date of March 8, 2004. (R. 19-21). In support of this conclusion, the ALJ relies on a portion of Dr. Lewis's April 27, 2005 examination report, stating Plaintiff was "doing significantly better after her fusion at C4-C5 . . . has solid fusion at C5-[C]6 . . . [and that] X-rays show good fusion taking place." (R. 19). The ALJ, however, overlooked subsequent

statements in Dr. Lewis's report that "[i]t is too early to be certain [Plaintiff] has gone on to a solid fusion. With regards to pain, it has improved, <u>but she has residual pain and activity limitations</u>." (R. 176)(underlining added). Dr. Lewis, moreover, unequivocally opined on September 17, 2004, in connection with Plaintiff's worker's compensation claim, that as a result of her cervical problem Plaintiff was "<u>to be continued on 100% disability</u>. She is not able to work even in a sedentary occupation." (R. 184)(underlining added).

In sum, the record provides substantial evidence that during the period March 8, 2004 through at least March 2006 the Plaintiff suffered from cervical spine nerve root compression (R. 159) characterized by neuro-anatomic distribution of pain (R. 182, 196), limitation of motion of the spine (R. 190), and motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss (*id*.) as required under Section 1.04.A to support a finding of disability. As such, Plaintiff meets the criteria to be considered disabled based on the Listing of Impairments for disorders of the musculoskeletal system for the period March 8, 2004 through March 2006, and the matter should be remanded for calculation of benefits.

As the matter is before the undersigned for a report and recommendation, however, the court considers whether the ALJ properly evaluated Plaintiff's disability claim under the remaining two steps of the analysis. The ALJ next considered whether Plaintiff, despite suffering from degenerative disc disease which neither met nor equaled any listed impairment, nevertheless retained the residual functional capacity to perform a side range of sedentary work. (R. 18-21).

**E.    "Residual Functional Capacity" to Perform Past Work**

The fourth inquiry in the five-step analysis is whether the applicant has the "residual functional capacity" to perform past relevant work.  "Residual functional capacity" is defined as the most work a claimant can still do despite limitations from an impairment and/or its related symptoms. 20 C.F.R. § 416.945(a).  If a claimant's residual functional capacity is insufficient to allow the performance of past relevant work, the ALJ must assess the claimant's ability to adjust to any other work. 20 C.F.R. § 416.1560(3)(c). Here, the ALJ found that, because of physical limitations, Plaintiff was unable to perform her past relevant work as a truck driver, packaging machine tender and short order cook. (R. 21). Plaintiff does not contest this finding. However, the ALJ also found Plaintiff possessed the residual functional capacity to perform a wide range of sedentary work within twelve months of the disability onset date of March 8, 2004, and was able to perform that work until March 2006, the time at which Plaintiff returned to work in an attempt to perform substantial gainful activity. (R. 21). This finding is not supported by substantial evidence in the record because as discussed, Discussion, *supra*, at 24, the ALJ violated the treating physician rule.

The ALJ did not consider Plaintiff's treatment visits to Dr. Lewis between March 9, 2004 and August 20, 2004. Specifically, the ALJ violated the treating physician rule because the record establishes Plaintiff visited Dr. Lewis on March 19, 2004, April 4, 2004, May 21, 2004, and July 14, 2004. (R. 193-200). After Dr. Lewis performed a cervical foraminotomy on Plaintiff March 9, 2004, Dr. Lewis placed Plaintiff on "total disability" with a return to work dependent upon recovery. (R. 159, 200). On April 4, 2004, Dr. Lewis

reported Plaintiff with "spasm radiating up into the occiput," recommended physical therapy, TENS unit and ultrasound treatments, discussed an occipital block, and continued Plaintiff on total disability. (R. 199). On May 21, 2004, Dr. Lewis reported Plaintiff "continue[d] to have severe cervical pain and pain at the base of her skull along with pain throughout her right arm" and again placed Plaintiff on "total disability." (R. 196). On July 14, 2004, after reviewing a June 9, 2004 MRI, Dr. Lewis suggested surgery at C4-5 in the form of an anterior cervical microdiscectomy and fusion, and continued to classify Plaintiff as "totally disabled." (R. 193-94). Dr. Lewis reported on July 16, 2004 that

> [w]ith regards to . . . work status, she returned to light duty work on 10/8/02 and remained partially disabled from 10/8/02 to 3/9/04. <u>She has been on total disability since 3/9/04.</u> When she was on light duty work she was capable of doing [D]ual [P]rinting, however at that time because it was lighter work then, she was not capable of doing regular work for Miken Co and <u>presently she is totally disabled and will remain on total disability</u>.

(R. 194)(underlining and bracketed material added).

Based on his physical examination as late as October 2005, (R. 173), Plaintiff remained totally disabled. Rather than grant controlling weight to Dr. Lewis's opinion that Plaintiff was disabled, the ALJ merely reiterated Dr. Lewis's diagnosis that Plaintiff "continued to have neck pain with right upper extremity symptoms after her first two operative procedures, and was confirmed to have recurrent cervical disc herniation at C4-C5 with radiculopathy, based on cervical MRI and reconstruction CT scans." (R. 19). An ALJ is not allowed to substitute his own expertise against that of a physician. *McBraver v. Secretary of Health and Human Services* 712 F.3d 795, 799 (2d Cir. 1983). Moreover, the ALJ failed to explain how Plaintiff's symptoms did not result in a reduction in her residual

functional capacity, improperly replacing a well-supported medical opinion by a specialist, Dr. Lewis, with the ALJ's conclusion that Plaintiff was able to perform a wide range of sedentary work. The ALJ's failure to credit Dr. Lewis's unambiguous disability diagnosis despite the ALJ's awareness of Plaintiff's additional symptoms (R. 19), does not constitute sufficient evidence to support the ALJ's conclusion Plaintiff had the residual functional capacity to perform a wide range of sedentary work.

Although the record reflects a detailed history of Plaintiff's treatment by Dr. Lewis, the ALJ further violated the treating physician's rule by relying on the findings of Dr. Coniglio and Dr. Cohen, two physicians hired by the New York State Worker's Compensation Board who each examined the Plaintiff once. (R. 185, 287). Applicable regulations specify several factors ALJ's must use to weigh medical opinions including: (i) the examining relationship, (ii) treatment relationship, (iii) length of treatment relationship, (iv) nature and extent of the treatment relationship, (v) supportability by laboratory findings, (vi) consistency of the opinion, (vii) and medical specialization. 20 C.F.R. §404.1527(d)(1-6). As a specialist, Dr. Lewis provided Plaintiff with treatment of her cervical spine from October 2001 through the date of the hearing before the ALJ on July 25, 2006. The record establishes Dr. Lewis substantiated Plaintiff's medical diagnoses with laboratory diagnostic tests including MRI's and CT scans, and the long-standing treatment relationship between Plaintiff and Dr. Lewis required the ALJ to provide an explanation to support the controlling weight given by the ALJ to the Worker's Compensation Board physicians, thereby effectively rejecting Dr. Lewis's opinion. 20 C.F.R. § 404.1527(f)(2).

The ALJ's dismissal of the findings of Plaintiff's medical specialist Dr. Lewis in

preference to a consultative examination conducted by Dr. Coniglio on behalf of the New York State Worker's Compensation Board, based on Dr. Coniglio's single examination of Plaintiff on August 25, 2004 (R. 185-92) further violates the treating physician's rule as stated in 20 C.F.R. §404.1527(d)(2). The regulations specify the Commissioner is required to provide good reasons for the lack of weight assigned to a treating physician's opinion. 20 C.F.R. §416.927(d)(2). Here, the ALJ asserted Dr. Coniglio found Plaintiff "temporarily disabled to a moderate degree with an ability to perform the strength demands of sedentary/light work, avoiding pushing, pulling, twisting, or applying an axial force greater than 10 pounds with the upper extremities and avoiding reaching above [plaintiff's] chest." (R. 20). However, in correspondence to Dr. Luthra, dated September 17, 2004, Dr. Lewis directly opposed Dr. Coniglio's suggested therapy stating

> [I] do not agree with Dr. Coniglio. The nerve conduction study is a painful test and is not going to change our recommendation for treatment of a cervical disc herniation. It is very unreliable for cervical radiculopathy. Nerve conduction studies in terms of neurosurgery, really only help from the upper extremities for an ulnar or median nerve entrapment syndrome. In terms of epidural steroid injections, also . . . [we] do not think that this is good management for this type of problem. The [patient] [sic] has severe pain. She is in our office today crying because her pain is so severe and not responsive to Hydrocodone . . . She is to continue on total disability. She is not able to work in even a sedentary occupation.

(R. 182)(underlining and bracketed material added).

The ALJ points to nothing in the record that medically contradicts Dr. Lewis's unambiguous opinion that Plaintiff was totally disabled on September 17, 2004, the date of Dr. Lewis's letter to Dr. Luthra opposing Dr. Coniglio's findings, and that her disability continued at least until October 2005. (R. 173). Further, had the ALJ found Plaintiff

disabled as of March 2004, and, thus, entitled to disability benefits, then, prior to terminating such benefits, the Commissioner would have been required to obtain substantial evidence establishing that Plaintiff's condition had medically improved to the point that Plaintiff was no longer disabled. *DeLeon*, 734 F.2d 930, 936 (2d Cir. 1984) ("having once established that a particular condition is disabling, a claimant is entitled to a presumption that as long as there is no change in the condition itself, or in the governing statutes or regulations, neither will the statutory classification of disability be changed . . . [and] . . . the secretary must apply the medical improvement standard in deciding whether to terminate benefits to an individual previously found to be disabled."). Because the ALJ erred in failing to find Plaintiff disabled as of March 2004, the ALJ never considered the extent of Plaintiff's medical improvement in October 2005, or thereafter, in accordance with the seven-step evaluation process set forth under 20 C.F.R. § 416.994(b)(5)(i)-(vii), as, by extension, required prior to terminating Plaintiff's benefits. As such, the court is left with Plaintiff's undisputed return to work, initially in February 2006 at less than the SGA level, and continuing in March 2006 at SGA level, as the sole evidence that Plaintiff's disability had ceased.

The court therefore finds that the ALJ improperly accepted the opinion of a non-treating physician over Plaintiff's treating physician as supported by the record, in violation of 20 C.F.R. § 404.1527, thus requiring a finding of disability and remand for calculation of benefits.

**F.** **Suitable Alternative Employment in the National Economy**

The ALJ concluded Plaintiff was unable to perform her past relevant work as a

packaging machine tender, truck driver, and short order cook. (R. 21). The ALJ then determined whether Plaintiff would be qualified or suitable for any position within the national economy. The Second Circuit requires that "all complaints . . . must be considered together in determining . . . work capacity." *DeLeon,* 734 F.2d at 937.  Once an ALJ  finds a plaintiff's impairments prevent a return to previous work, the burden shifts to the Commissioner to prove substantial gainful work exists and that the plaintiff is able to perform in light of her physical capabilities, age, education, experience, and training. *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

It is improper to determine a claimant's residual work capacity based solely upon an evaluation of the severity of the claimant's individual complaints.  *Gold v. Secretary of Health and Human Services*, 463 F.2d 38, 42 (2d Cir. 1972).  To make such a determination, the Commissioner must first show that the applicant's impairment or impairments are such that they permit certain basic work activities essential for other employment opportunities.  *Decker v. Harris*, 647 F.2d 291, 294 (2d Cir. 1981). Specifically, the Commissioner must demonstrate by substantial evidence the applicant's "residual functional capacity" with regard to the applicant's strength and "exertional capabilities."  *Id*. at 294.

An individual's exertional capability refers to the performance of "sedentary," "light," "medium," "heavy," and "very heavy" work.[11]  *Decker*, 647 F.2d at 294.  In addition, the Commissioner must prove that the claimant's skills are transferrable to the new

---

[11]  "Sedentary work" is defined as: "lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools....Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. §404.1567(a).

employment, if the claimant was employed in a "semi-skilled" or "skilled" job.[12] *Id.* at 294. This element is particularly important in determining the second prong of the test, whether suitable employment exists in the national economy. *Id.* at 296.

In this case, the ALJ properly determined Plaintiff could not return to her past work. (R. 21). The ALJ recognized Plaintiff's "ability to perform all or substantially all of the requirements of this level of work ha[d] been impeded by additional limitations." (R. 22). Plaintiff does not contest this determination.

The Second Circuit has directed that where a disability benefits claimant cannot perform the full range of sedentary work, a strict, mechanical application of the Act's medical vocational grids is improper; rather, the plaintiff must be evaluated on an individual basis, and that such evaluation "can be met *only* by calling a vocational expert to testify as to the plaintiff's ability to perform some particular job." *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989) (italics added) (reversing district court's decision upholding denial of plaintiff's claim for disability benefits and remanding for further evaluation of plaintiff on an

---

[12]  The regulations define three categories of work experience: "unskilled", "semi-skilled", and "skilled". *Decker, supra*, at 295.
    "Un-skilled" is defined as: "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  The job may or may not require considerable strength....primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in thirty days, and little specific vocational preparation and judgment are needed.  A person does not gain work skills by doing unskilled jobs."
20 C.F.R. §404.1568(a).
    "Semi-skilled work" is defined as: "work which needs some skilled but does not require doing the more complex work duties.  Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work.  A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks."
20 C.F.R. §404.1568(b).

individual basis, including testimony by a vocational expert, given that the medical-vocational grids do not apply to claimants who are unable to perform the full range of sedentary work). Furthermore, following a vocational expert's testimony, a plaintiff must be afforded an opportunity to rebut the expert's evidence. *Id*. In the instant case, the ALJ ignored, without basis, the findings of the vocational expert and the Plaintiff's testimony describing her limitations. (R. 294-310).

At the hearing, vocational specialist Peter Manzi ("Mr. Manzi") testified, and reviewed Plaintiff's credentials and limitations, concluding substantial gainful employment opportunities exist that an individual the same age and education of Plaintiff, who was capable of, at most, sedentary exertion, was capable of performing. (R. 306). These included receptionist, sedentary, semiskilled, with total job titles of 1,066,000 positions nationally and 6,000 in the Western New York region; and calculating machine operator, sedentary, semiskilled, with 507,000 positions nationally and 420 positions in the Western New York area. *Id*. Mr. Manzi, however, advised neither position was suitable for persons limited to only occasional fingering, feeling, gripping, and grasping, such as Plaintiff, because both types of jobs require frequent handling, and further testified the job positions were not suitable for individuals restricted from repetitive use of upper extremities for more than ten minute durations, who must rest every ten minutes, or, who cannot push, pull, or twist with greater than ten pounds with upper extremities, or work with arms above chest level. (R. 306-07).

Although Plaintiff testified she was unable to engage in employment requiring repetitive motion of her arms and hands, and her employment must allow her to stand and

sit at will, the ALJ failed to consider that Dr. Lewis's findings support Plaintiff's subjective complaints and that she was unable to work more than six hours each day because of her neck pain. (R. 297-98). Although the ALJ found Plaintiff was "currently engaging in SGA since March 2006," (R. 21) an ability to work "only on an intermittent basis is not the ability to engage in substantial gainful activity." *Koseck v. Secretary of Health and Human Services,* 865 F. Supp. 1000, 1014 (W.D.N.Y. 1994). That Plaintiff engaged in work on a part-time basis does not support a finding she had the ability to engage in substantial gainful activity. *Melville v. Apfel,* 198 F.3d 45 53-54 (2d Cir. 1999) (a claimant's participation in part-time work does not, by itself, establish claimant was able to engage in substantial gainful activity).

The ALJ's determination Plaintiff is not disabled during the period March 2004 through September 30, 3006, because she performed "sedentary work" thereafter, is not supported by substantial evidence in the record. Additionally, that Plaintiff engaged in part time substantial gainful activity after March 2006 does not preclude a plaintiff's claim. *Moore,* 278 F.3d at 924 (discussing that although employment during a period of claimed disability is probative of a claimant's ability to work, no similar consideration is recommended with regard to work performed after the claimed period of disability); *Goldstein*, 517 F.Supp. at 1317 (reliance on claimant's attempt to engage in substantial gainful activity following period of disability to deny benefits constitutes legal error by ALJ). Accordingly, the ALJ erred by determining Plaintiff was not disabled based on her capacity to engage in sedentary part time work after her alleged period of disability. *Sachs v. Astrue*, 567 F. Supp. 2d 423, 430 (W.D.N.Y. 2008) (discussing that a claimant's ability to return to work does not suggest the claimant should or could have returned to work at an

earlier date).

Finally, the court notes the Plaintiff has asserted she is entitled to benefits for the period following her commencement of part-time secretarial work after March 2006. Background, *supra*, at 3; Plaintiff's Memorandum at 8. Because the ALJ found Plaintiff was not disabled and thus not entitled to benefits, the ALJ did not address this issue. Therefore, the issue is not presented for judicial review, and any determination of whether Plaintiff's disability continued or ended after March 2006 should be made pursuant to 20 C.F.R. § 404.1594 (Social Security Administration will periodically review entitlement to benefits) and 20 C.F.R. § 404.1574(c) (Social Security Administration will determine entitlement to benefits during six-month period during which claimant unsuccessfully attempts to work because of impairment).


## CONCLUSION

Based on the foregoing, Defendant's motion should be DENIED; Plaintiff's motion should be GRANTED, and the matter should be REMANDED for calculation of benefits.

Respectfully submitted,

/s/ *Leslie G. Foschio*

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:  November 2, 2009
        Buffalo, New York

_____Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that the Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to the Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of the Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:        November 2, 2009
             Buffalo, New York

_____

41